# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 22-473 (DRD)** |
| Plaintiff | * | |
| v. | * | |
| **JOSE L. BERRIOS AQUINO** | * | |
| Defendant | * | |

## MOTION TO DISMISS THE INDICTMENT

**TO THE HONORABLE COURT:**

**COMES NOW**, defendant **Jose L. Berrios-Aquino**, by and through the undersigned attorney, and very respectfully **ALLEGES** and **PRAYS** as follows:

### I. PROCEDURAL STATEMENT

1. On November 3, 2022 an indictment with a sole violation to 18 USC § 922(o) was filed against defendant Berrios-Aquino for possession of an **ALLEGED** machinegun.

2. On November 4, 2022, defendant Berrios-Aquino, a licensed firearms instructor with both the National Rifle Association and the Puerto Rico Police, and a gunsmith in good standing with the firearms and gun sport's community was arrested by Alcohol Tobacco and Firearms Bureau's (ATF) agents.

### II. THE FACTS ACCORDING TO THE INDICTMENT

3. The Defendant is a known gunsmith with over 15 years of experience repairing firearms and teaching different safety and weapons training courses. The

Defendant possesses all necessary state licenses to possess and carry concealed weapons. The defendant is also licensed as a Firearms Instructor by both the Puerto Rico Police and the National Gun Rifle Association; he has a wide array of professional certifications related to products and brands. The defendant is an employee of Mudafort Xtreme Sports, a licensed range, armory and Federal Firearms Licensee. As part of his legitimate work defendant promotes, sells, teaches, cleans, fixes, paints or otherwise customize firearms.

4. In the captioned case an Indictment was filed by the government for a violation of 18 USC § 922(o), possession of a machinegun, one Sharp Brothers pistol, model Jack-9, serial number J9-03124. This firearm does not belong to the defendant and was not in his possession at the moment of seizure; the firearm belongs to a bona fide licensed customer of Mudafort Xtreme Shop named Wilmer Alicea. The firearm was seized by the ATF on October 24, 2022 pursuant to a Search and Seizure Warrant. The firearm in it of itself was not used for any illegitimate purpose other that the ATF's allegation that the firearm is a machinegun.

5. However, the ATF and Government contends that the firearm in question is a machinegun because it has a commercially available trigger (not homemade) called a Forced Reset Trigger (FRT). In this case the alleged machinegun had an Alamo-15 brand FRT. This type of trigger is available in the open legitimate firearms market. All major brands are readily available online or in retail stores. Due to the demand of these triggers they can be expensive.

6. The genesis of this issue comes from an Open Letter sent by the ATF to Federal Firearms Licensees on March 22, 2022.[1] The letter is not published or codified in the Code of Federal Regulations. The ATF's letter states that some of the forced reset triggers may convert a weapon into machineguns, however the letter does not indicate which brands, make, or specifications are the ones that can actually convert a firearm into a machinegun.

### III. APPLICABLE LAW, DEFINITIONS AND CONCEPTS

#### A. Second Amendment

7. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In interpreting this text, we are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." United States v. Sprague, 282 U.S. 716, 731, 51 S. Ct. 220, 75 L. Ed. 640 (1931); see also Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 188, 6 L. Ed. 23 (1824). Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation. See District of Columbia v. Heller, 554 U.S. 570, 576-77, 128 S. Ct. 2783, 2788 (2008).

#### B. National Firearms Act and Regulatory Scheme

---

[1] https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts.

8.  The National Firearms Act (NFA), was enacted on June 26, 1934. The law is an Act of Congress in the United States that, in general, imposes an excise tax on the manufacture and transfer of certain firearms and mandates the registration of those firearms. The ATF alleges that "this legislation is a direct response to gang violence, this act imposed criminal, regulatory and tax requirements on weapons favored by gangsters: machine guns, silencers and sawed-off shotguns."[2] The Gun Control Act of 1968 further regulates interstate commerce in firearms by generally prohibiting interstate firearms transfers except by manufacturers, dealers and importers licensed under a scheme set up under the Act. Prior to 1934 firearms labeled as machineguns were freely owned by the people; after 1934 people became less wise and through Government imposition were restricted in the possession of machineguns until the slippery slope continued with the outright banning of machineguns.

9.  At the federal level, machine guns are regulated by the NFA (26 USC § 5801 et seq.) and 1968 Gun Control Act, as amended by the 1986 Firearms Owners' Protection Act (18 USC § 921 et seq.). Among other things, federal law (1) requires all machine guns, except antique firearms, not in the U. S. government's possession to be registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives and (2) bars private individuals from transferring or acquiring machine guns except those lawfully possessed and registered before May 19, 1986, and includes the payment of a stamp of up to $200 per machinegun (including those pieces/parts that are considered machineguns) transfer or manufacture making it prohibitive at the moment of enactment

---

[2] https://www.atf.gov/our-history/timeline/national-firearms-act-1934#:~:text=This%20legislation%20is%20a%20direct,silencers%20and%20sawed%2Doff%20shotguns.

of the NFA the exercise of a fundamental right. Only specialized licensees are able to possess most of the machineguns. Although not a straight up ban of machineguns (as some legal machineguns that fit the now narrow exceptions are still marketed at exorbitant prices) the NFA operates and is administered by the ATF an the Government as a ban on machineguns.

**C. Relevant Definitions**

10. As a general matter a semiautomatic firearm is one that after pulling a conventional semi-automatic trigger, the shooter must manually release it and allow it to travel to its reset point under light spring pressure before the trigger can be pulled again.

11. As its name implies, the FRT-15's trigger is forced to reset quickly after a shot is fired when the bolt carrier group returns forward. This allows for fast follow-up shots, but the trigger must still be pulled by the user each time a round is fired. The user must continuously exert movement over the trigger with its finger after each shot ranging from 1mm to 3mm squeezes. Modern advances have allowed such delicate and sensitive precision in the trigger squeeze. To provide perspective 1mm is the size of a sharpened pencil point and 3mm is around the size of a sharpened crayon point, however, if the trigger is completely depressed and not released after one shot the weapons seizes fire until the trigger is once again released and pressed. Every individual bullet fired has one complete trigger motion that is initiated by the user's finger (one bullet, one squeeze).

12. Since passing the National Firearms Act in 1934, Congress has consistently defined "machineguns" by their ability to fire multiple rounds "by a single function of the trigger." Pub. L. No. 73–474, 48 Stat. 1236; 26 U.S.C. § 5845(b).

13. In contrast to a FRT, when a full-auto or machinegun trigger is pulled and remains depressed, the firearm will continue to fire repeatedly until it's out of ammunition or the trigger is released. However, if the user of a FRT completely presses down on the trigger the trigger will not be forced into reset (the hammer remaining in its forward uncocked position) after firing a round and the user must release and pressure again in order to fire the next round.

14. Some of the mechanisms are patented and litigation is ensuing due to patent infringement amongst some manufacturers.

### III. ARGUMENTS

### A. The NFA and Relevant Statutes as Applied and Administered are Unconstitutional

15. The Second Amendment right is exercised individually and belongs to all Americans. It is this individual right gifted to all Americans by the Creator himself that infuses man with the right to keep and bear "arms." the Second Amendment was not intended to lay down a "novel principl[e]" but rather codified a right "inherited from our English ancestors," Robertson v. Baldwin, 165 U.S. 275, 281, 17 S. Ct. 326, 41 L. Ed. 715 (1897).[3]

---

[3] In Nunn v. State, 1 Ga. 243, 251 (1846), the Georgia Supreme Court construed the Second Amendment as protecting the "natural right of self-defence" and therefore struck down a ban on carrying pistols openly. "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, **in the smallest degree**; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this right, originally belonging to our forefathers, trampled under foot by Charles I and his two wicked sons

16. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be **infringed by Congress**. United States v. Cruikshank, 92 U.S. 542, 553 (1875).

17. The 18th-century meaning of arms is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." A New and Complete Law Dictionary.

18. Machineguns are not the weapons of gangsters; they are the weapons of Americans and revolutionaries, and they are subject to the same protections as the arms of old as machineguns are a modern invention[4]. Machineguns are widely used without issue by law-abiding citizens that possess them within the narrow exception of the law, and it is only because of prohibition that gangsters use them. If machineguns would have been readily available at the time of the American Revolutionary War, and later during the

---

and successors, re-established by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own Magna Charta!" Ibid.

[4] Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, e.g., Reno v. ACLU, 521 U.S. 844, 849, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997), and the Fourth Amendment applies to modern forms of search, e.g., Kyllo v. United States, 533 U.S. 27, 35-36, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. District of Columbia v. Heller, 554 U.S. at 582.

enactment of the Bill of Rights in 1791, the revolutionaries would have used them to fend of the tyranny of the King.

19. Under this circumstances possession or use of a machinegun currently has some reasonable relationship to the preservation or efficiency of a well-regulated militia. Defendant Berrios is one of those persons that would clearly fall under the able-bodied men that conform the militia. If the militia would be called any men could readily transform must firearms by utilization of simple metal or iron wedges into machineguns; the rapid fire making them no more unusual than a semiautomatic weapon. Machineguns are "part of the ordinary military equipment [and] its use could contribute to the common defense" in no unusual way as not to be recognized under the Second Amendment. See United States v. Miller, 307 U.S. 174, 178, 59 S. Ct. 816, 818 (1939). The history of the machinegun is self-explanatory. The mechanism to allow for automatic fire was invented in 1884 by Hiram Stevens Maxim and up until 1934 what only constitutes a simple mechanism, chip, modification, etc. that allowed automatic fire was available freely to all Americans up until gangsters tainted its use, something that they still do today. Nowadays, with modern advances the slippery slope continues with the Government trying to make almost anything into a machinegun in order to circumvent the protection of the Second Amendment; it has become nothing more than a slippery slope of the continuous erosion of a Right in order to preserve a prohibition of a bygone era. The time has come that technology had evolved into such a way (FRT, bump stocks, and all other that will come) that the Government will have to come and face the music: Is there any actual difference in the same firearm just by the movement of the finger?

20. "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear **bearing arms supplied by themselves and of the kind in common use at the time**." See Miller 307 U.S., at 179, 59 S. Ct. 816, 83 L. Ed. 1206.[5] The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." Up until 1934 it would have been understood, but not for Congress's unconstitutional action, that men were expected to appears with arms that would be semiautomatic or automatic… and nowadays the same guns could easily be modified, sometimes by a simple wedge to be automatic.

21. If in fact the firearm alleged to be possessed by Defendant Berrios is deemed to be a machinegun it was all done within the lawful confined spaces of a range and within the applicable licensing. Because Puerto Rico prohibits the outright possession of a machinegun, such ban should be held unconstitutional also as it curtails a guaranteed right. See Section 2.16 of the Puerto Rico Weapons Act of 2020, Act No. 168 of December 11, 2019, as amended.

**B. The Current Regulatory Scheme is Unconstitutional**

22. The NFA requires registration, special licensing, payment of a $200.00 stamp per firearm or mechanism, making prohibitive the possession of a firearm today or

---

[5] We therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. See District of Columbia v. Heller, supra.

even more so back in 1934 (price has not changed), and the narrow exceptions of the law only permit possession of certain firearms that are almost antiques.

23. Although the Second Amendment has its limits "[a] statute which, under the pretense of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional"). See <u>District of Columbia v. Heller</u>, 554 U.S. at 629 citing <u>State v. Reid</u>, 1 Ala. 612, 616–617 (1840).

24. The current regulatory scheme amounts to a destruction of the second amendment right to possess a machinegun, perpetuates a bureaucracy that hunts down citizens and ensures that only criminals and bandits have access to these types of firearms. Being Puerto Rico one of the jurisdictions with one of the highest counts of machineguns convictions albeit the ban.

**C. The ATF's Open Letter is Vague**

25. On March 22, 2022 the ATF sent an Open Letter to all Federal Firearms Licensees. The letter is not published or codified in the Code of Federal Regulations. The ATF's letter states "that some" of the forced reset triggers are firearms and may convert a firearm into machineguns, however the letter does not indicate which brands, make, or specifications are the ones that can actually convert a firearm into a machinegun. Defendant possesses an Alamo-15 trigger, the letter is neither directed at the general public, nor specifies that the Alamo-15 trigger, or any other, is a machinegun.



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives
*Office of Enforcement Programs and Services*
*Office of Field Operations*

Washington, DC 20226
www.atf.gov

March 22, 2022

**OPEN LETTER TO ALL FEDERAL FIREARMS LICENSEES**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recently examined devices commonly known as "forced reset triggers" (FRTs) and has determined that some of them are "firearms" and "machineguns" as defined in the National Firearms Act (NFA), and "machineguns" as defined in the Gun Control Act (GCA).

26. Due process requires that a penal statute be sufficiently definite to give notice to a person of ordinary intelligence of the prohibited conduct, in order for that person to conform his or her conduct within the proscribed legal confines. Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). Therefore, one may challenge the constitutionality of a penal statute based upon the argument that the statute is vague, as the "[vagueness] doctrine incorporates notions of fair notice or warning." Smith v. Goguen, 415 U.S. 566, 572-73, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974).

27. "Vagueness challenges that do not involve First Amendment freedoms must be analyzed as applied to the specific facts of the case at hand." Maynard v. Cartwright, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988); United States v. Lim, 444 F.3d 910, 915 (7th Cir. 2006).

28. A penal statute maybe void for vagueness "for either of two independent reasons." City of Chicago v. Morales, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). First, a statute may be unconstitutionally vague if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." Id. (citing Kolender, 461 U.S. at 357). **A statute may also be unconstitutionally vague if it "fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute.**" Lim, 444 F.3d at 915 (citing Karlin v. Foust, 188 F.3d 446, 458-59 (7th Cir. 1999)). As observed by the United States Supreme Court, the requirement that a penal statute provide minimal guidelines in order to discourage arbitrary enforcement is "perhaps the most meaningful aspect of the vagueness doctrine." Smith, 415 U.S. at 574. Without these minimal enforcement guidelines provided within a statute, "policemen, prosecutors, and juries [are allowed] to pursue their personal predilections." Id. at 575.

29. The alleged machinegun for which he was indicted possesses a "forced reset trigger" which is not specifically named as "illegal" by the Alcohol Tobacco and Firearms Bureau's (ATF) Open Letter of March 22, 2022. Defendant understands that the use of this trigger does not make a firearm a "machinegun" within the definition of the Law and defendant, but for the allegation, was complying with all applicable laws in the use of the firearms, both as a licensee and as an instructor. Defendant argues that because § 922(o) can basically encompass almost any mechanism that creates a machinegun, it is up to the ATF to specify with its technical knowledge which brand or at least which minimal specification conforms with its interpretation of "machinegun." As he is being prosecuted based upon the interpretation of an Open Letter defendant understand that the letter is

vague, and he was not put on notice that his possession of the machine gun was illegal, if indeed it was.

30. A person of ordinary intelligence under his circumstances, would be unable to decipher the meaning of "some" FRT so as to make his possession legal, because the letter itself provides no definition or other guidance as to what type or brand of FRT constitutes a machinegun. With these types of technical parts, what constitutes or not a machinegun is and has become a mess and a nuisance for the ordinary citizen.

31. Therefore, this Open Letter violated the **rule of lenity**, that rule, sometimes referred to as the **principle of legality**, is implicit in the concept of due process. The rule of lenity provides notice to the people, limits arbitrary prosecutions, and preserves the separation of powers.

32. The Latin Concepts are: "*nullum crimen sine praevia lege poenali*" & "*nulla poena sine praevia lege poenali.*" As expressed by the Supreme Court, the rule of lenity requires that "before a man can be punished as a criminal under the federal law, his case must be 'plainly and unmistakably' within the provisions of some statute." United States v. Gradwell, 243 U.S. 476, 485, 61 L. Ed. 857, 37 S. Ct. 407 (1917) (quoting United States v. Lacher, 134 U.S. 624, 628, 33 L. Ed. 1080, 10 S. Ct. 625 (1890)); see also Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972) (criminal statute must give person of ordinary intelligence fair notice of conduct forbidden by a statute). Courts should decline to interpret a criminal statute to encompass situations which a reasonable layperson could not foresee as being within the ambit of the statute.[6]

---

[6] The right of the state to impose punishment is constrained by the principle of legality, the boundaries of which are defined by considerations of due process, fundamental fairness, and just limits on the state's deployment of the coercive instruments at its

33. The first purpose behind the rule of lenity is to "ensure[] that criminal statutes will provide fair warning concerning conduct rendered illegal." Liparota v. United States, 471 U.S. 419, 427 (1985). Although this is "required," it has been referred to as a "fiction" because it is unlikely that a criminal will consult the United States Code before acting. United States v. R.L.C., 503 U.S. 291, 309 (1992) (Scalia, J., concurring) (citation omitted).

34. The second purpose behind the rule of lenity is to prevent "arbitrary or discriminatory prosecution and conviction." United States v. Kozminski, 487 U.S. 931 at 949 (1988). Arbitrary enforcement is the inherent result of "delegat[ing] to prosecutors and juries the inherently legislative task of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes." Id.

35. Lastly it preserves the separation of powers which is further eroded as explained below.

36. The Open Letter itself recognizes its vagueness urging citizens to call the ATF for "clarification." In fact, the Open Letter only exacerbates the problem by ratting the cage without offering a clear and reasonable way to comply making the ATF's

---

disposal. See Kadish et al., Criminal Law and its Processes 152 (9th ed. 2012) ("Perhaps most obvious [among the justifications for the legality principle] is the need to give individuals fair warning as to the conduct that could subject them to prosecution. Another is the need to control discretion of police, prosecutors, and juries. Reflecting these concerns, the legality principle bars both retroactivity and vagueness.") (emphasis in original); McBoyle v. United States, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931) (Holmes, J.) (noting that fair warning should apprise people "in language that the common world will understand, of what the law intends to do if a certain line is passed"); see also United States v. Lanier, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."). Cited from United States v. Conigliaro, 384 F. Supp. 3d 145, 153 (D. Mass. 2019).

interpretation of the Law ambiguous and inappropriate, specially for the criminal realm. Defendant can only wonder how that kind of call would go: "hello, I have several items that you may deem to be machineguns" said over the phone the soon to be indicted man. Calling an Agency for clarification is unreasonable as criminal law is established by statute and must be written. It is not up to the whims of a bureaucrat to determine legality or illegality.

**D. The Letter violates the Administrative Procedures Act**

37. The federal Administrative Procedures Act (APA) creates two different types of processes for the creation of administrative rules: formal rulemaking, which requires a hearing on the record with the presentation of evidence, similar to a courtroom proceeding; and informal rulemaking, which requires notice to the public and the opportunity to comment on the proposed rule.

38. Government agencies create new rules and modify, amend, or repeal existing rules through the informal rulemaking process much more often than the formal rulemaking process. The informal rulemaking process first requires notice to the public of the proposed new rule. In some cases, an agency may publish a notice of a planned new rule in order to solicit public input before it has finished drafting the rule. Otherwise, it publishes the proposed rule, along with any relevant commentary, in the Federal Register.

39. In the formal rulemaking process, the agency must conduct a hearing on the record, at which evidence is presented. An administrative law judge, or a panel of judges, makes the final determination regarding the rule. Parties who will be directly affected by the rule are entitled to notice of the hearing, and they may also intervene directly in the proceeding.

40. Nothing like this process has been followed in this case and in clear contrast with the bump stock ban of 2018-2019. See Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (Final Rule). The Final Rule was promulgated to clarify the definition of "machinegun" as found in 26 U.S.C. § 5845(b). This past action means that the agency has the time and resources to effectively follow the Administrative Procedures Act. On December 18, 2018, Acting Attorney General Matthew Whitaker announced that the Department of Justice has amended the regulations of the ATF, clarifying that bump stocks fall within the definition of "machinegun" under federal law, as such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger.

41. The Final bump stock rule went into effect March 26, 2019; 90 days from the date of publication in the Federal Register. The final rule clarifies that the definition of "machinegun" in the Gun Control Act and NFA includes bump-stock-type devices[7], i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull

---

[7] A "bump stock" is a device that replaces the standard stationary stock of a semiautomatic rifle—the part of the rifle that generally rests against the shooter's shoulder—with a sliding, non-stationary stock that permits the shooter to rapidly increase the rate of fire, approximating that of an automatic weapon. Final Rule at 66,516. A bump stock does so by channeling the recoil energy from each shot "into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." Id. at 66,518. The bump stock "harnesses the firearm's recoil energy as part of a continuous back-and-forth cycle that allows the shooter to attain continuous firing" following a single pull of the trigger, producing a rapid bumping of the trigger against the shooter's stationary finger. Id. at 66,533. That design allows the shooter, by maintaining constant rearward pressure on the device's extension ledge with the trigger finger as well as forward pressure on the front of the gun, to fire bullets continuously and at a high rate of fire to "mimic automatic fire." Id. at 66,516. This continuous cycle of fire-recoil-bump-fire lasts until the shooter releases the trigger by removing his finger from the extension ledge, the weapon malfunctions, or the ammunition is exhausted. Id. at 66,519.

of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

42. Congress expressly charged the Attorney General with the "administration and enforcement" of the NFA, id. § 7801(a)(1), (a)(2)(A), and provided that the Attorney General "shall prescribe all needful rules and regulations for the enforcement of" the NFA, id. § 7805; see id. § 7801(a)(2)(A).[8] The Gun Control Act of 1968 also expressly delegates **administrative and rulemaking authority** to the Attorney General to "**prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter**." Id. § 926(a). The Attorney General has delegated the responsibility for enforcing and administering the NFA and the Gun Control Act to ATF. See 28 C.F.R. § 0.130(a).

43. The ATF has not followed any formal or informal rulemaking procedure and relies in an Open Letter. Under these specific circumstances of dealing the ATF is without authority to act as it is punishing an otherwise perfectly licensed citizen without the backing of a rule. The ATF's actions are unenforceable as no notice or due process safeguards have been followed. Therefore, no Rule is opposable to the defendant and no deference should be granted to the agency.

---

[8] The Attorney General, exercising his regulatory authority, first included a bump stock device—the Akins Accelerator—within the statutory definition of "machinegun" in 2006. See ATF Ruling 2006-2; see also Akins v. United States, 312 F. App'x 197, 199 (11th Cir. 2009). The Akins Accelerator, unlike many bump stocks, used "an internal spring" to "reposition and refire" the firearm. Akins, 312 F. App'x at 198. ATF later limited the devices it defined as machine guns by concluding that bump stocks that operated without an internal spring were not machine guns. Final Rule at 66,514.

44.    In this hollow exercise the ATF is in violation of the Separation of Powers Clause under Article I, Section 1 of the U.S. Constitution as an agency is creating special categories that are resulting in criminal accusations infringing in Congress's power to enact criminal laws. "[T]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the cases of federal crimes, which are solely creatures of statute.") Staples v. United States, 511 U.S. 600, 602 (1994) The ATF's actions are therefore arbitrary and capricious.

**V. CONCLUSION**

**WHEREFORE**, it is respectfully requested from this Honorable Court that it DISMISSES THE INDICTMENT as in violation of:

1. The Second Amendment;
2. Vagueness Doctrine;
3. Due Process.

And that it grants any and all other remedies not expressly requested here, but that are available under Law, equity and justice.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto this 15th day of November 2022.

**S/ALLAN AMIR RIVERA FERNANDEZ**
**ALLAN RIVERA FERNANDEZ**
**USDC-PR 301904**
**LUIS RAFAEL RIVERA LAW OFFICES**
CAPITAL CENTER BLDG.
SUITE 401
239 ARTERIAL HOSTOS AVENUE
HATO REY, PUERTO RICO 00918

PHONE: (787) 763-1780
FAX:   (787) 763-2145
E-MAIL: allan.a.riverafernandez@gmail.com

**I HEREBY CERTIFY**: That I on this same date electronically filed the foregoing document with the Clerk of Court for the District of Puerto Rico, through the CM/ECF electronic filing system, which will provide notification of this filing to the United States Attorney's Office for the District of Puerto Rico.

**S/ALLAN AMIR RIVERA FERNANDEZ**
**ALLAN RIVERA FERNANDEZ**
**USDC-PR 301904**
**LUIS RAFAEL RIVERA LAW OFFICES**